Ms. Knight. Good morning. May it please the Court, Counsel. My name is Camille Knight. I'm here on behalf of Appellant Dr. Leovarez-Mendez. We have three issues on appeal in this case, and as a roadmap, I'd like to address the sufficiency argument first, the sentencing argument next, and the jury instruction argument in that order. As far as the sufficiency, the agreement in conspiracy cases is not to be lightly inferred. There's a lot of similarity of conduct in this case, but the government's main witness testified that he and Dr. Mendez never spoke about any agreement, and we contend that the evidence the government cites in support falls short of proving the agreement and the conspiracy. The obstruction enhancement was not... I assume you concede, or I want to make sure you agree, that an actual evidence of an actual agreement is not required. Yes, Your Honor. You can get at it circumstantially. Yes. So why is this case not enough? Circumstantial evidence is sufficient, but we contend it was, it was, there was not sufficient evidence in this case. The government cites a lot of... You agree the doctors worked together quite a bit. Yes. Coordinated with... They ran a clinic together for many years. They had had a falling out during the time period of the conspiracy. There was a lot of evidence at trial about how the clinic was physically separated. It was like two wings of the same building. It was difficult to see from one wing to the other. The doctors did not share staff people. The doctors did not split cash proceeds. The doctors were not talking for a period of time. Dr. Pena had bought a building that he planned to open a competing clinic in. Why wouldn't we, why wouldn't we defer to the district court on any credibility findings that they had with regard to those facts? Well, Your Honor, I think from our perspective, the, the agreement falls short, and when the star witness says, we never talked about this... You've already agreed that that's not required. That's not required. An explicit contract or discussion is not required. But for instance, when the government contends that part of the basis for the proof of the conspiracy was that the doctors saw each other patients, the government actually asked Dr. Pena about normal patients. So going back in time to the inception of the clinic, predating the proposed conspiracy, Dr. Pena testified that for these regular patients in the clinic, one of the doctors would go on vacation and the other one would, of course, fill in. So there was not any questions to him about how, how it was agreed that they would see each other's, quote, drug-seeking patients. And on, in, in Dr. Pena's testimony, there was a sort of nebulous time period to which he testified about seeing each other's patients and couldn't really pin it down. The government also relies on similar paperwork. The paperwork was prepared by office staff. Similar costs, the costs were also set by the office staff. Being in the same building, but there again was lots of testimony about how the clinic was physically split. And there was, with regard to seeing each other's patients, the evidence was about one particular patient that Dr. Mendez saw on one occasion in 2016, or 2017, and one patient of Dr. Pena's who Dr. Mendez saw one time and refused to see on another occasion. No office staff people testified other than one of the medical assistants, Dr. Rodrigo Rodriguez. Circling back to the obstruction enhancement, the district court did not make findings. And Dr. Mendez preserved his objections to the substantive reasonableness of any findings the court made. At sentencing, there was no finding in the PSR about trial testimony being perjurious. The government filed an objection. The addendum referenced an application note to the guidelines suggesting that the testimony at issue was not material. But even if it was material, there was no evidence of the testimony being a factor of Dr. Mendez was testifying about discrete events that happened between five and seven years prior to the date the case was tried. And he was asked, for instance, about a date on which he let one of his patients go. He admitted on cross that he could be wrong about that date. And it's a matter of just weeks in terms of that date. Perjury requires more than the defendant's story of events just being not credible. And all the district court had to do to adopt the government's arguments, as the government claims it did, was to say, for the reasons set forth by the government, I'm adopting its objection or I'm sustaining the objection. But it did not. It did adopt the PSR and the addendum, neither of which had any findings of obstruction in them. And the court knew how to incorporate by reference the government's arguments. It did so explicitly when it stated, the court stated, I agree with the government's assessment that the drug quantity estimate is exceedingly conservative. So as opposed to that statement where he acknowledges the government's arguments and adopts it, there was no similar discussion of the government's objection to the perjury or to the obstruction enhancement based on proposed perjury. So if we agree with you that there was no independent finding and that such a finding was required, what's the prejudice or harm to your client? Well, we also contend that the record doesn't support any such finding because it has to be a willful, willful lie. There's no evidence that that willful lie happened. The testimony was about discharging a patient, saying that he didn't put something in a medical record, and having one conversation with an x-ray technician out of hundreds of thousands of x-rays. There seemed to be some conflict in the timeline that was presented in the reasonings that were given for the clients, the Lyons specifically, who were dismissed. And so again, wouldn't that be a credibility determination that should be left to the trial court? I think that the record on that point is that there were, it's a little muddled, because the question was about dismissing one particular Lyons patient. But then there were some, on cross, there were some more questions about, oh, well, you started dismissing this entire In the context of this clinic, the government presented evidence that 70 to 80 patients per day were seen at the clinic. And Dr. Mendez presented evidence that 50,000 patients were seen at the clinic from its inception, and that the clinic had 60 employees at the time the search warrant was a single episode that happened five or six years prior. And added on top of that, that the questioning was muddled in terms of which Lyons are we talking about, because there were many of them. I don't think there's evidence showing that Dr. Mendez was willfully misstating something rather than just confused. Counsel, what do you say about the, how do you explain the level five categorization for, it just happens to be all the patients that come in seeking drugs, and no more notation was made, but he's an O5 patient, and that was understood plainly by both physicians and their staff, and it was routinely done, consistently, as I read the record. Yes. It just happens to be, is that just a happenstance? Well, again, the record keeping of the clinic was maintained by the clinic employees, so the fact that records are similar, or an electronic record, or a level five exam was similar, I mean, it could be that the same level was, you know, the same HIPAA code for x-ray was the same on the doctor's records. But it's not, yes, it describes a category of patients. It just happens that the content of the category are drugs, are patients that have come there for drugs. Well, I think particularly after 2014, when the controlled substances were recategorized, Your Honor, that that was a notation that just applied for people who were receiving those prescriptions in general, the controlled substances. So to say that because they have paperwork that both says level five on it is something other than documents. Something else followed from that categorization, a standard charge, which implied nothing more than a sales transaction. Right. And there was testimony at trial that the charges were set by the office manager who did research on market rates for similar services, and that that office manager was the person who set the rate for those visits. Moving on to the jury charge for the substantive counts, I know there's a lot of briefing on this, and it's pretty comprehensive. I think my best argument to you about the jury instruction is to contrast the instructions here with those in Le Martiniere, in which there was a fourth element, not an element added, but a fourth clarifying number added in the court's instructions there, which was the defendant knew he was acting in an unauthorized manner when he dispensed the controlled substance or intended to act in an unauthorized manner. And then it coupled that with a good faith instruction, which was the instruction that was requested here as well. It was substantially similar to the good faith instruction in Le Martiniere. And that was found by this court to be important when it was reviewing the charge as a whole, because it said that, the court said that, in Le Martiniere, it was very directly set forth that the controlled substance was dispensed, the defendant dispensed it knowingly or intentionally, it was not authorized, and the defendant knew it was not authorized. And then it had the good faith instruction noting that subjective belief that the treatment was proper is a defense. And here, the reason why we quoted the whole colloquy in the reply brief about the substantive instruction is because it's very clear that trial counsel is saying to the trial judge, yes, the way that you've changed the wording here solves part one, but we also contend that a clarifying instruction, the good faith instruction, should be given to make sure that the jury understands that it's subjective intent and not just this kind of, the way the instruction was written, knowing or intentionally not issued for a legitimate medical person. It's kind of weird and passive. And so for that reason, trial counsel said, yes, that solves part one of the Ruan directions, but part two should be a good faith instruction. I wanted to go back to the conspiracy for a minute. One of the things that the government relies on is the splitting of the cash proceeds and the sort of holding money for each other. But the testimony was from Dr. Pena that at the front desk where money was collected, be it by credit card or check or cash, at lunchtime every day, one of the doctors would take that money to not leave it at the front desk. And then at the end of every day, another doctor, the other doctor would take it. So to not leave that money at the front desk. So to say that this office function where you don't want to leave a bunch of receipts and checks and money at the front desk is evidence of them holding money for each other I don't think gets there. Additionally, about the- Back to Lamar Nier, where in the opinion do you say that we require a good faith instruction? Because I'm not seeing that. No, no. I did not mean to imply that the good faith instruction is required in Lamar Nier, Your Honor. I was just noting that it was given in that case. And when the court reviewed the charge as a whole, it noted- Why isn't the knowing instruction enough? As trial counsel said below, a clarifying instruction is helpful to make sure that the jury understands that subjective intent is a defense. That's a best practice argument. Why is it legally flawed if it's not done? What was the concern here was not the actual words, was the call of the words. And, you know, this sentence structure, does it do enough to tell the jury that if a person had, if a doctor had a good faith belief that his dispensing of the prescription was proper, that that did not merit a conviction? And in Lamar Nier and in the Fourth Circuit case Smithers, the good faith instructions there were used as a clarifying mechanism. Becky, you've saved time for rebuttal. Yes. Thank you, Your Honor. Ms. Hayworth. Good morning. May it please the Court, Gail Hayworth on behalf of the United States. Now, unless the Court has a particular order you'd like me to address the issues in, I will go through them as they were briefed. So starting with the instruction error first, the district court did not err, let alone plainly err in instructing the jury on the required mens rea, on the unlawful distribution counts or on the conspiracy count. Regarding the standard of a review, as for the statement of the elements for those counts, this court reviews for invited error because Mendez asked for and approved of the instruction that the court actually gave the jury, telling the district court that the given instruction solved part one of his issue, which was his concern and his objection to the wording of the elements. So under invited error, this court reviews only for manifest injustice, and under Aikens, because he makes no argument that satisfies that burden, his instruction error claim fails. But even if this court reviews under the more lenient plain error standard, his instruction argument still fails. Now, Mendez cites the Fourth Circuit's opinion in Smithers to argue that he preserved error, but the defendant in Smithers, unlike Mendez, did not affirmatively tell the district court that its statement of the elements solved his issue and his problem. So Smithers doesn't help Mendez, and he didn't preserve error under that case. So under the first two prongs of the plain error standard, Mendez cannot show error, let alone clear or obvious error, in the instructions on the unlawful distribution count. Now, he argues that the district court erred by not charging the jury that it had defined that he knew he was acting in an unauthorized manner. But that is exactly what the court charged the jury with here, by requiring the jury to find that he knowingly dispensed a controlled substance by a prescription knowingly or intentionally issued not for a legitimate medical purpose in the usual course of professional practice. Now, Section 841 makes it a crime for a person except as authorized to knowingly or intentionally dispense a controlled substance. And although licensed doctors registered with the DEA are authorized to write valid prescriptions for controlled substances, by the implementing regulation, a prescription is only authorized, that is valid, when a doctor issues it for a legitimate medical purpose in the usual course of his professional practice. So it follows that a doctor knows he is acting in an unauthorized manner when he prescribes a controlled substance by a prescription knowingly or intentionally not issued for a legitimate medical purpose in the usual course of his professional practice. In other words, the court's instructions here simply translated what it means to knowingly act in an unauthorized manner. The case law supports this understanding as it treats those two concepts, knowingly acting in an unauthorized manner and knowingly writing prescriptions not for a legitimate medical purpose or in the usual course of professional practice, it treats those two concepts as synonymous. And that's in La Martiniere, Ajahi, Qureshi, Capistrano. Those concepts are the same. Amendus provides no reason to believe that there is any daylight between knowingly acting in an unauthorized manner and knowingly issuing prescriptions not for a legitimate medical purpose in the usual course of professional practice. As for the conspiracy instruction, he also cannot show any error, let alone clear error in that instruction because under Qureshi and Ajahi, this court affirms similarly worded instructions with the only difference here in the conspiracy charge is that it even more clearly requires amends reia. So he cannot show error in that instruction, let alone clear or obvious error. And even if he can satisfy the first two prongs, he cannot satisfy the third because he can't show a reasonable probability that he would have been acquitted had the court worded its instructions to use the language he now requests for the first time on appeal. Indeed, had the court instructed the jury that it had to find that Amendus knew he was acting in an unauthorized manner, it most certainly would have defined unauthorized by reference to that DEA regulation, and then we would have essentially the same instructions that the court gave here. Moreover, he cannot show a reasonable probability of a different outcome had the court used the words he now wants the court to have used because the court's given instruction sufficiently focused the jury on Amendus' subjective mental state and the requirement that he must know that the prescriptions he issued were illegitimate. And both the government and the defense counsel interpreted the court's instructions as requiring a subjective mental state and repeatedly conveyed that requirement to the jury over and over again. Turning to the good faith instruction, the district court did not abuse its discretion by declining to give that proposed instruction because that instruction neither didn't state a substantively correct statement of the law, it was substantially covered by the court's charge given to the jury, and he was able to effectively prevent his defense. So all of the requirements for showing an abuse of discretion and failing to give that instruction were not met here. Unless the court has any further questions about the instruction, I'll turn to the sufficiency of the evidence. There was ample evidence to support the jury's verdict on Count 1, the conspiracy charge. He argues that there was insufficient evidence of agreement, that the evidence only showed that he acted independently of Dr. Pena to unlawfully dispense controlled substances without an agreement, but a rational jury could have easily found that Dr. Pena and Dr. Mendez agreed to unlawfully dispense controlled substances as they each let the other doctor use the cover of their shared business to unlawfully dispense controlled substances knowing that that is what the other doctor was doing. They also unlawfully distributed it in ways that mirrored each other, which showed a concerted action. They unlawfully dispensed the same controlled substances, hydrocodone, alprazolam, and promethazine with codeine. They had the same policy of preferring referrals. They charged the same price, $250, to their drug seekers, even though that price was not on what Mendez claimed was their fee schedule, and their paperwork, their super bills matched each other. And Pena testified that Mendez and Pena filled out the front of that paperwork, the super bills, with nothing marked out on the front except a level 5 visit and a price of $250. And besides letting each other use the business to cover their unlawful dispensation, they also further helped each other's unlawful distribution by seeing each other's drug-seeking patients when the other doctor was unavailable and securing the other doctor's cash. So this was more than enough evidence for a reasonable jury to find an agreement. And unless the Court has any further questions on the obstruction count, then we ask you to affirm. Thank you. Ms. Knight, you have five minutes. Thank you, Your Honor. I just wanted to list some record sites for the Court staff. Dr. Pena testifying that he believed Dr. Mendez knew that Pena was doing something illegal. That's Record 1217, but admitting that they did not ever discuss it. The issue of holding the money from the front desk for each other, that's covered at Record 1145-46, 1236-38, and 1218-29. With regard to seeing each other's patients, the practices of the doctors covering for one another for normal patients also is at 1140-42, 1194-95, and the fact that Dr. Mendez saw Jorge Hernandez one time is at Record 1344. I wanted to also point out that usually when the issue of obstruction comes up, it's normally because there has been a finding in a PSR and the district court has adopted the PSR as most district courts do at sentencing, and the defendant is objecting to it. Here, it was not the same. In fact, the PSR documents, the probation officer alluded to the testimony not being material, not rising to the level of being willful, and the district court talked about the government's arguments in connection with drug quantity, but did not ever once mention the government's arguments regarding the obstruction enhancement. And again, in context, when we're talking about the thousands of patients that were seen at this clinic, and the testimony going back to events five to seven years before the case was tried, I don't believe there's any evidence of willful lying in Dr. Mendez's testimony. And unless the court has any other questions, I will give you 2 minutes and 45 seconds back. Thank you. Case is submitted.